**Application of LAKE COUNTY ECONOMIC OPPORTUNITY, Inc.**
Docket No. 71358-CCB, Order No. 9845.
Florida Public Service Commission.
January 26, 1972.

Jefferson G. Ray, III, Eustis, for the applicant.

John H. Wilbur, Jacksonville, for Greyhound Lines, Inc., protestant.

John Curry, for the commission staff and the public generally.

Chairman JESS YARBOROUGH, Commissioners WILLIAM T. MAYO and WILLIAM H. BEVIS, participated in the disposition of this matter.

BY THE COMMISSION.

Pursuant to notice, the commission by its duly designated hearing examiner, Leon F. Olmstead, held public hearings on this matter on October 12 and 13, 1971, at Tavares. The commission, having considered the entire record, now enters its order in this cause.

Lake County Economic Opportunity, Inc. ("applicant" or "LCEO") herein seeks a certificate of public convenience and necessity authorizing transportation of passengers as a common motor carrier between named cities and communities in Lake County. It is a Florida non-profit corporation operating under the

supervision and funding of the Office of Economic Opportunity, a federal agency. As such it receives funds annually from federal sources to defray its operating expenses and therefore has no assets or liabilities. It has a grant for the fiscal year ending June 30, 1972, for the specific purpose of establishment and operation of the proposed common carrier bus service between various points within Lake County specially serving the transportation needs of low income, elderly and disadvantaged residents by affording them an inexpensive and convenient means of getting to such places as the shopping and business centers, social security and welfare offices, and surplus commodity distribution warehouse. At the end of the fiscal year for which the grant has been made (June 30, 1972), the applicant must either turn its transportation operations and equipment over to a non-profit authority, such as a Lake County transportation authority, or it can apply for additional funding for further operations or abandon the project and dispose of its equipment as federal surplus property. The possibility of the county accepting the operation is contingent on it paying its own way. Under these circumstances, any grant of authority should be made non-transferable except to a non-profit public authority. Temporary operating authority was denied by our order no. 9735 entered on October 29, 1971.

Applicant has purchased eight new buses, each of fifteen-passenger capacity, for utilization in the proposed bus service. Six buses will be in operation with two in reserve at all times. The buses are not air-conditioned and have fixed non-adjustable seats; however, considering the short distances to be traveled, in the interests of economy, they will serve the needs of this proposed service.

At the conclusion of the applicant's case, it was permitted to file as a late filed exhibit, amended schedules and routes. This was filed November 1, 1971. By its late filed exhibit no. 11, applicant has deleted, added to, and modified routes in a small degree, primarily to minimize duplication of the routes of protestant Greyhound. It has also submitted, as a part of exhibit no. 11, amended time schedules of operations.

On Route 1, applicant has deleted the Lady Lake-Leesburg portion, starting instead at Whitney and the portion traversing U. S. 441 between its junction of S.R. 44 on the west and a point due south of the city of Lisbon on the east, replacing this portion with a loop along S.R. 44 to the north to the city of Lisbon and then south to intersect U. S. 441 near the southwest corner of Lake Eustis. It has extended the Mount Dora intracity route east from the city of Mount Dora to the city of Sorrento and on to the community of

Mount Plymouth. In addition, an intracity Eustis route has been proposed in lieu of a Leesburg to Cassia route; this route is covered in part by the Paisley-Tavares route. No evidence was presented at the original hearing as to the Eustis intracity route not covered by the Paisley-Tavares run or to the Sorrento-Mount Plymouth part of the Mount Dora-Mount Plymouth route. However, considering the proximity of the areas, the general nature of the testimony as to the population characteristics and needs thereof would be equally applicable to these route modifications.

The applicant was supported by eight public witnesses, and approximately 154 persons in attendance registered as supporting the application. In addition, a representative of the fifth district of the Florida Department of Transportation supported the application as serving the long-range objectives of his department to reduce the number of cars on the highways and development of mass transit to serve the more rural areas. Of the public witnesses, one, a retired school principal from Mount Dora, lives in the low income area and uses his personal vehicle frequently to help elderly persons in his neighborhood by transporting them where they need to go. He has no personal transportation needs. Protestant Greyhound does not meet the need because it serves only depot to depot, necessitating a taxi from the depot to destination. Two witnesses reside in a trailer park on U. S. 441 east of Leesburg. Of the 94 families living in the park, 24 are widows, 10 of whom do not drive. One of these witnesses, a part-time park employee, uses his personal vehicle to help those without transportation to get to the doctors, shopping, etc. The other, a widow has no transportation and must resort to taxi cabs for monthly shopping trips for groceries or visits to the doctor. This lady was employed but had to give up her job since it was costing her $3 a day by taxi. She called Greyhound and was advised that they would not stop in front of the trailer park because the congestion on U. S. 441 made it too dangerous. This witness, likewise, finds the bus depot too far from her destination to serve her needs.

Another witness living in Okahumpka is legally blind although she sees well enough to get around and ride a bus. She hires friends for her once-a-month grocery shopping trips to Leesburg. Another witness from Eustis works as a handy man, he also uses his car to transport people about such as for shopping, visits to the doctor and to the surplus commodity warehouse. If the proposed service were available, he would use it to supplement his automobile which is in an advanced state of disrepair. Another witness, a long time resident of Leesburg, needs transportation to the hospital, commodity warehouse in Tavares and shopping. He cannot drive and has to

go to town almost daily in caring for his invalid wife. He has paid his neighbors to bring him to Tavares and has used the existing public transportation service; however, he would prefer the proposed service to Greyhound because the proposed service would pick him up and drop him in his neighborhood instead of at the downtown bus depot. The last two witnesses are from Paisley, one a retiree with physical disability, the other a retired minister. Both drive their own cars and frequently transport neighbors to doctors, grocery shopping, etc., sometimes making two or three trips per day. The Paisley community is about 90% low income retirees, many of whom cannot afford a car and for whom a taxi cab from Eustis, the closest available, is equally impossible.

Protestant Greyhound Lines, Inc., Greyhound Lines-East Division, services the area with routes along U. S. 27 and U. S. 441 between Leesburg, Eustis, Tavares and Mount Dora, Minneola, Clermont and Groveland. It feels that despite the difference of operations, the applicant will dilute available traffic to its detriment.

Taxi cab operators in Mount Dora, Leesburg and Eustis testified as to their authority, equipment and operations pointing out that the taxi cabs operate from door-to-door, have baggage or parcel accommodating facilities and are available on call 24-hours a day, seven days a week at rates comparable or below that of the bus for groups of four or five people.

At the conclusion of the examiner's hearing, protestant Greyhound, inter alia, made a motion for a directed verdict in favor of Greyhound because the application failed to comply with the requirements of §323.03(1)(d), Florida Statutes, which requires that any application for a certificate of public convenience and necessity for common carriage by any motor carrier include the proposed time schedule of operation. The protestant cited Tropical Coach Lines, Inc. v. King, 147 So.2d 318 (Fla., 1962), in support of the motion. Along with Florida Motor Lines Corp. v. Douglass, 7 So.2d 843 (Fla., 1941), the case stands clearly for the proposition that a time schedule of operation must be an element of the commission's adjudication, that submitting such a schedule by the close of a hearing is a jurisdictional requisite. The latter proposition must, however, be considered in the context of subsequent commission action, approved by the Supreme Court in Commercial Carrier Corporation v. Mayo, 217 So.2d 836 (Fla., 1969), where the court found no deviation from the essential requirements of law in commission orders numbered 7670, 7757 and 7779.

In order no. 7670 (dockets 7855-CCT and 7996-CCT, application of Alterman Transport Lines, Inc.), the commission granted

the applicant permission to amend its application restrictively to designate the regular routes and the schedules of operation, and authority was granted conditionally, subject to commission receipt of any amended application, with copies to opposing counsel. Order no. 7670 was not a final commission order, and thus differs from the *Tropical Coach Lines* case, supra, where a final grant of authority was conditioned upon applicant's submitting and obtaining approval of schedules to be observed. In truth, the difference appears to be one of form than of substance, but the procedure of permitting a schedule to be filed after hearing and before entry of a final commission order, which was followed in Alterman, appears to be legally permissible and should again be followed for the sake of consistency. In addition, the applicant has made a prima facie case of public convenience and necessity. The motion for directed verdict, therefore, was denied by the examiner and we concur therein.

From the foregoing, the commission concludes that the applicant has shown that public convenience and necessity require the grant of this authority. Further, it appears that the grant of this authority will have no adverse effect on existing transportation facilities and transportation as a whole in the territory involved. Finally the applicant is qualified to provide this service.

It is therefore ordered that the application of Lake County Economic Opportunity, Inc., 1224 Hazzard Avenue, Eustis, Florida 32736, be and the same is hereby granted and that certificate no. 1075 be issued so as to authorize the transportation of passengers in buses with a capacity of fifteen or less over the following routes —

1. From Whitney east on State Road 44 to State Road 468. Then on State Road 468 to Griffin Road and Leesburg city limits. East on Highway 441 to State Road 44, then north to Lisbon, then on State Road 473 to Highway 441 thence to Tavares. Return to Whitney over same route in reverse.

2. From Minneola south on Highway 561 to Clermont, then west on State Road 50 to Groveland and Mascotte, continue on State Road 50 to Stuckey. Return to Minneola over same route in reverse.

3. From Clermont west on State Road 50 to Groveland. Then on State Road 19, travel north to Howey-in-the-Hills, then west on State Road 48 to Okahumpka, then on State Road 33 to Leesburg. Return to Clermont on same route in reverse.

4. From Tavares east on State Road 452 to Golden Triangle Shopping Center in Mt. Dora, then north on State Road 19A to junction with State Road 19, thence north on State Road 19 to Eustis. From Eustis continue north on State Road 19 to Dona

Vista, thence to Umatilla and Altoona. From Altoona on State Road 42 east to Paisley. Return to Tavares over same route in reverse.

5. Intracity Mount Dora. Also trips from Mount Dora to Sorrento on State Road 46. Return to Mount Dora over same route in reverse.

It is further ordered that the authority granted herein be restricted against any transfer to another person, body or corporation unless said person, body or corporation is a non-profit public authority.

It ordered that the authority granted herein contain no charter rights.

It is further ordered that this authority be held in abeyance pending applicant's compliance with this commission's rules and regulations pertaining to safety, road tax, license tags, insurance and all other applicable rules, regulations and requirements of this commission.